| | |
|---|---|
| TAMAR YOUNG-MOORE,<br>　　　　Plaintiff, | )<br>)<br>) |
| v. | )　　　CAUSE NO.: 2:12-CV-195-PRC |
| CAROLYN W. COLVIN,<br>Acting Commissioner of the<br>Social Security Administration,<br>　　　　Defendant. | )<br>)<br>)<br>)<br>) |

## OPINION AND ORDER

This matter is before the Court on a Complaint [DE 1], filed by Plaintiff Tamar Young-Moore on May 16, 2012, and a Plaintiff's Brief in Support of Reversal of Commissioner's Final Decision [DE 17], filed on October 2, 2012. Plaintiff requests that the July 22, 2010 decision of the Administrative Law Judge denying her claims for disability insurance benefits ("DIB") and supplemental security income ("SSI") be reversed or remanded for further proceedings. On January 8, 2013, the Commissioner filed a response, and Plaintiff filed a reply on January 22, 2013. For the following reasons, the Court grants Plaintiff's request for remand.

## PROCEDURAL BACKGROUND

On March 21, 2008, Plaintiff filed applications for DIB and SSI, alleging an onset date of April 23, 2007. The applications were denied initially on May 16, 2008, and upon reconsideration on July 9, 2008. Plaintiff timely requested a hearing, which was held on December 16, 2009, before Administrative Law Judge ("ALJ") Dennis R. Karmer. In appearance were Plaintiff, her attorney Rachael King, medical expert Dr. Walter Miller, and vocational expert Thomas Gusloff. A supplemental hearing was held on June 16, 2010, at which Plaintiff, Ms. King, and vocational expert

Grace Gianforte appeared. The ALJ issued a written decision denying benefits on July 22, 2010. He made the following findings:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2013.

2.  The claimant has not engaged in substantial gainful activity since April 23, 2007, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.  The claimant has the following severe impairments: hypertension, disorders of the back, thyroid disorder, arthritis in various areas, right shoulder disorder, and anemia (20 CFR 404.1520(c) and 416.920(c)). Abdominal pain and right eye disorder do not represent severe impairments within the meaning of the Social Security Act.

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, I find that the claimant has the physical residual functional capacity to lift/carry 20 pounds occasionally and 10 pounds frequently, sit 2 hours, and stand/walk 3 hours without interruption, sit 6 hours in an 8 hour work day, and stand 6 hours. She is limited to no overhead reaching and all other reaching on an occasional basis with the right hand, frequent reaching with the left hand, frequent handling, fingering, feeling, pushing, or pulling, frequent operation of foot controls, occasional climbing, balancing, stooping, kneeling, crouching, or crawling, no moving mechanical parts or operating a motor vehicle, occasional exposure to unprotected heights, humidity, wetness, dust, odors, fumes, pulmonary irritants, extreme cold, extreme heat, or vibrations, and moderate exposure to noise. She has the mental residual functional capacity for mildly limited ability to respond appropriately to usual work situations and to change in a routine work setting.

6.  The claimant is capable of performing past relevant work as a data entry clerk, accounts receivable clerk, and machine operator. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.  The claimant has not been under a disability, as defined in the Social Security Act, from April 23, 2007, through the date of this decision (20 CFR

404.1520(g), 416.920(g), 404.1520(f), 416.920(f), 404.1571 *et seq.*, and 416.971 *et seq.*).

(AR 19-26).

On April 5, 2012, the Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481. On May 16, 2012, Plaintiff filed this civil action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of the Agency's decision.

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c) and 42 U.S.C. § 405(g).

## FACTS

### A. Medical Background

Plaintiff was born in 1963 and attended two years of college. She worked and contributed to the social security system from 1979 to 2008. Plaintiff suffers from chronic anemia, asthma, headaches, hypertension, obesity, and thyroid goiter.

On December 3, 2004, an ultrasound of the neck showed findings consistent with multinodular goiter and hypoechoic lesion of the upper pole of the left thyroid lobe.

On a March 24, 2005 treatment record, Plaintiff's "problems" were listed as hypertension, enlarged thyroid, asthma, obesity, anemia, and dyspepsia. On August 24, 2005, Plaintiff was seen as a new patient by Crystal Kelly, M.D. and reported a history of asthma, thyroid problem, hypertension, and anemia. She reported significant headaches as well as swelling in her ankles. Dr.

Kelly noted that Plaintiff was obese. Dr. Kelly assessed an enlarged thyroid, lower extremity edema, asthma, and obesity. That same date, an EKG was normal.

On January 27, 2006, Dr. Kelly examined Plaintiff for a follow-up on right arm pain. Dr. Kelly noted that a January 17, 2006 x-ray of the cervical spine showed mild left neural foramen narrowing at the C4-C5 and C5-C6 level. An x-ray of the hand was unremarkable. Plaintiff's shoulder pain continued, but it was not as severe. Dr. Kelly noted Plaintiff's history of anemia. Plaintiff had no spinal pain on palpitation but had pain across the right shoulder. Her gait was normal.

On January 31, 2006, Plaintiff underwent an outpatient physical therapy initial evaluation and was assessed with 4/5 strength of the right upper extremities.

On April 19, 2006, Plaintiff presented at Saint Margaret Mercy hospital with complaints of chest pain. She was given a diagnosis of "musculoskeletal strain left flank" and a secondary diagnosis of a history of iron deficiency, anemia, abnormal uterine bleeding, a history of obesity, and a history of neck radiculopathy. An exercise treadmill stress test was negative. In the diagnosis, G. Scott Beauregard, M.D. noted that Plaintiff was obese and carried a lot of weight, particularly around her abdomen. The doctor noted that followup with her gynecologist was necessary to treat her anemia. Plaintiff reported that she had recently undergone physical therapy for her neck radiculopathy, and Dr. Beauregard noted that the problem appeared to be resolving well. Plaintiff's blood pressure was stable during her hospitalization.

On February 7, 2007, Plaintiff was seen by Dr. Kelly for hypertension, right neck mass, peptic ulcer disease, and upper back pain and right shoulder pain. On February 12, 2007, Plaintiff was seen by Hesham M. Bazarra, M.D., an endocrinologist, for a thyroid evaluation. On February

15, 2007, Plaintiff under went a radioiodine uptake test and thyroid scan; the impression was that the right lobe was markedly enlarged by a dominant cold nodule.

On March 20, 2007, Plaintiff presented to Dr. Kelly for follow up on her thyroid after seeing Dr. Bazarra. She also complained of abdominal pain. It was noted that Plaintiff was anemic, with iron studies showing extremely low iron levels. Plaintiff reported no headaches, chest pain, shortness of breath, or swelling in the legs. Plaintiff underwent an ultrasound on her thyroid on March 27, 2007. On April 28, 2007, Plaintiff presented for follow-up on her hypertension, shortness of breath, headaches, dizziness, and a refill of her blood pressure medication. She reported pain in her right arm/shoulder/upper extremity for two months and that she had been dropping items from her right hand. Plaintiff had been seeing Dr. Bazarra for her thyroid. On August 28, 2007, Plaintiff was seen for a thyroid nodule, hypertension, and right upper arm pain. Dr. Kelly found Plaintiff's right hand strength to be 4/5.

On September 7, 2007, Plaintiff participated in physical therapy. She complained of ongoing right neck, shoulder, and arm pain for eight months and that she had difficulty holding things with her right hand. The physical therapist assessed right side strength of 3/5. On October 17, 2007, Plaintiff was seen for hand weakness (resulting in a referral for occupational therapy), an enlarged thyroid (resulting in a referral to an endocrinologist), and bronchitis. Dr. Kelly found bilateral hand grip weakness.

On November 6, 2007, Ronald E. Jamerson, MD evaluated Plaintiff at the referral of Dr. Kelly for her thyroid and diagnosed her with thyroid goiter.

A November 12, 2007 MRI of Plaintiff's cervical spine revealed broad-based degenerative disk protrusion with moderate canal stenosis and deformity of the thecal sac anteriorly at C4-5 level

with no significant neural foraminal narrowing, and broad-based disk bulge with flattening of thecal sac anteriorly at C5-6 level with no significant neural foraminal narrowing. The same date, an MRI of Plaintiff's right upper extremity revealed at least a 90% partial tear in the suprasinatus tendon and severe infraspinatus tendonitis.

On November 21, 2007, Plaintiff participated in occupational therapy for her right hand weakness. The occupational therapist diagnosed 4/5 right hand, wrist, and forearm strength.

On April 10, 2008, Plaintiff was examined by B. Sheikh, M.D. on behalf of the disability determination bureau. Her chief complaints were noted as high blood pressure, arthritis, and thyroid problems. She reported that when her high blood pressure is uncontrolled she experiences severe headaches that last up to two days and the only thing she can do is lie down. She reported arthritis in the knees, hands, and shoulders, that physical therapy did not help, and that the MRI that was ordered because of the pain in her shoulders showed arthritis and degenerative disc disease of the spine. Plaintiff reported popping and cracking in her knees and falling easily. She had pain in her right heel, which was numb, poor balance, and swelling in both ankles. Plaintiff reported a diagnosis of a thyroid problem in 2001, which makes her weak and short of breath. Plaintiff reported abdominal pain due to ulcers.

Upon examination, Dr. Sheikh noted that Plaintiff is morbidly obese at 5'7" and 262 pounds. Plaintiff appeared comfortable in the seated and supine position. No anatomical deformities of the spine were noted, and Plaintiff had full range of motion in the lumbar, cervical, and thoracic regions. The examination of Plaintiff's upper extremities was normal, with Dr. Sheikh noting full range of motion in all upper extremities and muscle strength of 5/5 in all major muscle groups. Similarly, the lower extremities showed no anatomical deformities, no swelling, stiffness, effusion, or atrophy, and

strength was 5/5 in all major muscle groups. Plaintiff had a normal gait and was able to perform all gait-related movements without difficulty. Dr. Sheikh found that Plaintiff did not need an ambulatory aid and noted that a cane had not been prescribed by a doctor. Dr. Sheikh found normal grip strength of 5/5 bilaterally with good fine finger manipulative abilities, including the ability to button, zip, and pick up coins. Dr. Sheikh's impression was multiple joint pain due to arthritis, hypertension not controlled by medication, and history of thyroid problems.

On June 30, 2008, Plaintiff presented to Saint Margaret Mercy Medical Associates with complaints of shoulder pain and arthritis of the spine. She was diagnosed with right-sided thyroid goiter. Plaintiff reported that she had seen a gastroenterologist two years earlier, she occasionally gets lower extremity edema, she has headaches, and she has asthma. She reported that she had had a bad headache the week earlier and eventually got relief with two aspirin.

A July 1, 2008 x-ray of Plaintiff's knees revealed marginal osteophytes in both knees that suggested osteoarthritis in both knees.

On July 2, 2008, J. Smejkal, M.D. examined Plaintiff for the Disability Determination Bureau. Plaintiff's chief complaints were breathing problems, ulcers, hypertension, arthritis in the spine, shoulders, arms, and wrists, and her thyroid. She reported a history of asthma and difficulty with shortness of breath as she gets older. She reported severe pain in her abdomen but that her ulcers were controlled by medication. Plaintiff reported that she started seeing her doctor for shoulder pain in 2005. She had therapy for her shoulder in 2005 and 2007. At the time of the examination, she had pain in both hands and wrists, causing her to drop things, she had no strength in either hand due to pain, and she had occasional swelling in both hands. Her pain was an 8 on a scale of 1 to 10. She was diagnosed with arthritis to the spine while in the hospital and was told that

there was nothing that could be done for the pain. She was taking medication for her hypothyroidism and high blood pressure.

On examination, Plaintiff reported abdominal pain. Dr. Smejkal recognized that she was obese. He noted spinous or paraspinal tenderness in the lumbar spine with mild decreased range of motion, but full range of motion in the cervical and thoracic region. In her upper extremities, Dr. Smejkal found pain and stiffness to the right shoulder and both hands and wrists with decreased range of motion in the right shoulder only. He found full range of motion in all other upper extremities, and strength was 5/5 for all major muscle groups. In the lower extremities, he found no anatomical defect or swelling, and Plaintiff had full range of motion and 5/5 major muscle strength. Plaintiff's gait was normal but slow due to pain. She was unable to stoop, squat, or walk heel to toe or tandemly due to pain. Dr. Smejkal found no need for an ambulatory aid and noted that no doctor had prescribed one. He found normal grip strength of 5/5 bilaterally with good fine finger manipulative abilities, including the ability to button, zip, and pick up coins. His impression was bronchial asthma, gastric ulcer controlled with medication, history of arthritis of lumbar spine, history of thyroid disorder, and high blood pressure controlled on medication.

On a CBC result, a handwritten note dated July 14, 2008, indicated that Plaintiff was anemic.

On July 17, 2008, George T. Asteris, M.D. saw Plaintiff for a cough and for pain on the right side of her body radiating from her head to her shoulders and into her chest, arm, and leg. In her history, she reported occasional abdominal pain. Dr. Asteris recognized that Plaintiff is obese. His impression was multinodular goiter, hypertension, and a history of asthma. He scheduled her for testing.

Both of Plaintiff's ankles were x-rayed on July 31, 2008, revealing well-defined plantar calcaneal enthesophytes in both ankles, indicating an arthritis-like inflammation where tendon meets the bone. However, this was not in the areas of Plaintiff's pain.

On an August 25, 2008 intake form for Saint Margaret Mercy hospital, it was noted that Plaintiff's ankles were swollen and had been constantly painful. Plaintiff also reported pain in her right shoulder that was painful at rest, with range of motion, and to the touch. Plaintiff was anemic and had uterine fibroids. She was diagnosed with non-pitting edema of the ankles and was given compression stockings on discharge.

On September 30, 2008, Plaintiff underwent a total abdominal hysterectomy and bilateral salpingo-oophorectomy. It was noted that she was severely anemic and had multiple uterine fibroids.

On January 27, 2009, Plaintiff presented with a chief complaint of pain in her legs and possibly ulcers. The notation was mild swelling/effusion of the right knee and right ankle with decreased range of motion and tender to palpation. She was given an ankle brace and an ace bandage for her knee.

On April 17, 2009, Plaintiff reported pain when walking and the need for an assistive aid or support when she walks. She was given a prescription for a walking cane.

On August 3, 2009, Plaintiff visited the emergency room at Community Hospital, complaining of knee pain for one month. Her right knee was slightly swollen and tender to the touch. At discharge, she was given a document regarding choosing and using a cane.

On December 16, 2009, Walter Miller, M.D., the medical expert who testified at the first hearing, completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical). He opined that Plaintiff could frequently lift and carry 10 pounds, occasionally lift and carry 20

pounds, sit for 2 hours at a time, stand and walk each for three hours at a time, and sit or stand for a total of 6 hours in an 8-hour workday. He opined that Plaintiff does not need a cane. As for the use of her hands, he recognized that she is right-handed and found that with her right hand she could never reach overhead, occasionally reach in all other directions, and frequently handle, finger, feel, and push/pull and that with her left hand she could frequently perform all activities. He found that she could occasionally climb stairs and ramps, climb ladders or scaffolds, balance, stoop, kneel, crouch, and crawl. Finally, he opined that she could never be exposed to moving mechanical parts or operating a motor vehicle. Dr. Miller left blank the sections that asked for an explanation or medical evidence to support his opinions.

On February 2, 2010, Plaintiff underwent a cholecystectomy (gall bladder removal), and the discharge diagnosis was acute and chronic cholecystitis and cholelithiasis.

On February 23, 2010, J. Singh, Ph.D., HSPP, and Harry E. Gunn, Ph.D., HSPP, both licensed clinical psychologists, issued a Psychological Evaluation for the disability determination process. Their diagnostic impression on Axis I was major depressive disorder (recurrent), and they assigned a GAF of 57. On a Medical Source Statement of Ability to Do Work-Related Activities (Mental), Dr. Singh set forth Plaintiff's mental limitations, indicating that Plaintiff's ability to understand, remember, and carry out instructions was not affected by her mental impairment and that she had no limitation in her ability to interact with the public or supervisors. He also indicated that she had a mild limitation in her ability to respond appropriately to usual work situations and to changes in a routine work setting.

*1.      December 16, 2009 Hearing*

a.      Plaintiff's testimony

The ALJ observed that Plaintiff walked very slowly into the hearing room, using a cane. The ALJ observed that Plaintiff barely raised her right hand for the oath, commenting that he did not know if she used effort.

Plaintiff testified that she is five feet, seven and one-half inches tall and weighs approximately 250 pounds. Her worst medical problem is that she has a lot of "trouble" with the right side of her body from her neck to her foot. She is right-handed. In 2008, her brother let her use his cane, and, in 2009, her doctor prescribed a cane but she could not obtain it. Her right leg was bothering her so much that she went to the emergency room at Community Hospital and was given a cane there. She uses the cane with her right hand but she only uses it about 25% of the time inside her house because she tries to hold on to or lean on things like a chair, desk, table or wall. She can walk at a slow pace about a block with the cane but can walk only a few feet without it. She can stand for 10 minutes but then has to either move around or sit down. Her body "stiffens up" when she sits, and it is hard to get up. She can sit for an hour, and then she has to get up to move around. She can climb two or three stairs if she can hold on.

Plaintiff testified that she can drive a car about a mile or two but then her right leg will stiffen. If she is shopping in a store, she can walk 10-15 minutes and then has to use a cart. She drops more than half of the things she holds with her right hand, and it is hard to grip things. She testified that it is hard to button or zip with her hand but she can button a blouse very slowly with her left hand. If she is using the computer, she can use her right hand less than 50% of the time; she

11

can only write with her right hand but she cannot write for long because her hand will cramp and stiffen. Plaintiff can carry a gallon of milk with her left hand but can carry only half a gallon with her right hand. She can get a can above her head with her left arm but only does this about 25% of the time. She cannot reach up with her right hand.

Plaintiff testified that she feels neck pain most days and it is level 7 pain, with 0 being no pain and 10 being pain that would cause one to go to an emergency room.

She testified that she has had headaches for a long time but they are getting worse. She gets headaches about three times a week, sometimes the pain is at level 10, and the headaches can last from one to three days. About a quarter of the time that she has a headache she has to lie down because she cannot do anything else; she takes over-the-counter medicines to relieve her symptoms.

In an eight hour time period, Plaintiff lies down about two or three hours. She cannot kneel, squat, or bend over to touch her toes. Plaintiff has swelling in her right arm and hand, both ankles, and her right knee, and her doctor has told her to elevate her legs to help her ankles. She forgets things, such as what she is trying to do such that she has to "backtrack." (AR 125). Plaintiff feels tired most of time, and she either sits down or lies down. She explained that sometimes she wants to do certain things but her body does not allow her to do them.

b.      Medical expert testimony

At the hearing, Dr. Walter Miller, a board-certified surgeon, testified as an impartial medical expert. He testified that Plaintiff has a thyroid goiter but lab tests and biopsies indicate there is normal thyroid function. He testified that Plaintiff's hypertension appears to be controlled by medication and that Plaintiff has iron deficiency anemia that appears to be related to diet but is also related to dysfunctional uterine bleeding, which is no longer an issue post-hysterectomy. Dr. Miller

testified that Plaintiff complained of right-handed weakness but that Dr. Smejkal's July 2, 2008 physical exam showed a normal grip. Dr. Miller noted that Plaintiff complains of swelling in both ankles but that there is no evidence of edema on any of several physical examinations. He testified that Plaintiff has knee complaints and that arthritis has been diagnosed but that there are no other abnormal findings. Dr. Miller found that Plaintiff's complaints about her right shoulder are bona fide with a tendon tear and decreased range of motion, which would limit her work function. Dr. Miller testified that Plaintiff has shortness of breath, that no pulmonary function test has verified its significance, and that there is no evidence to support that Plaintiff has cardiac problems.

Dr. Miller's opinion is that Plaintiff can do light work and that she can stand and walk each for three hours and sit for two hours in an eight-hour period. He testified that there is no indication that Plaintiff needs a cane. He opined that Plaintiff can never reach overhead with her right hand but she can do other reaching occasionally; she can use both of her hands for frequent fingering, handling, feeling, and pushing/pulling. Dr. Miller completed an RFC assessment, which the ALJ included in the record. Dr. Miller opined that Plaintiff's condition does not meet or equal a listing.

He testified that, although a doctor noted that Plaintiff has poor balance, the other medical records do not indicate its cause or that balance is a significant problem. Dr. Miller testified that Plaintiff could experience chronic rather than acute pain in her right upper extremity that would limit her motion but that should not affect her ability to concentrate or focus. He testified that Plaintiff's chronic shoulder problem could cause problems sleeping if she moved it in a certain way but that it probably would not interrupt her sleep because people with this problem have a subconscious tendency not to move it during sleep.

c.      Vocational expert testimony–Thomas Gusloff

Thomas Gusloff, vocational expert, testified that Plaintiff's past jobs included data entry clerk, proof machine operator, security guard, mail clerk, child monitor, and census supervisor. Mr. Gusloff prepared a written summary of Plaintiff's past work that was entered into evidence at Exhibit 12E. (AR 359).

The ALJ posed a hypothetical question to Mr. Gusloff based on Exhibit 12F, which is the Medical Source Statement of Ability to Do Work-Related Activities (Physical) form completed by Dr. Miller on December 16, 2009. The ALJ asked whether a person of Plaintiff's age, education, and past work who had the limitations identified in Dr. Miller's Medical Source Statement could perform any of Plaintiff's past work or any work, including work with transferable skills. Mr. Gusloff responded that the hypothetical person would not be capable of Plaintiff's past work but would be capable of performing jobs as an insurance clerk, time keeper, and brokerage clerk II. Mr. Gusloff also testified that if a person would be off-task 20 percent of the day, she could not be employed anywhere. Mr. Gusloff further testified that if a person was limited to lifting 10 pounds occasionally and less than 10 pounds frequently and could only occasionally use her right dominant extremity, no jobs would be available because she could not use her right arm for handling and fingering.

2.      *June 16, 2010 Hearing*

a.      Plaintiff's testimony

The ALJ conducted a supplemental hearing on Plaintiff's disability claims because additional evidence was submitted after the first hearing, including a consultative examination. The ALJ noted that Plaintiff used a cane in her right hand. Plaintiff testified that she was experiencing increasing pain since the last hearing, that her hands "lock up" and she frequently drops things that she is trying

to hold, that she cannot take a shower if she is alone because she might fall, that she has problems putting on clothes and doing her hair because her arms are weak, and that she has constant pain on her right side from her neck down her right arm to her hand. Plaintiff testified she has daily throbbing headaches that cause her to sit down and then lay down. She testified that she recently went to the emergency room and had been hospitalized for abdominal pain; she was told that she needed surgery because her gall bladder was inflamed. She testified that she uses a cane because her knees, especially her right knee, bother her a lot and her ankles swell after she is standing for ten minutes or after walking. She also testified to swelling in her knees, arms, and hands. She testified that her doctors told her to put her feet up, and she does.

b.    Vocational expert testimony–Grace Gianforte

Grace Gianforte, a vocational expert, based her testimony on Mr. Gusloff's summary of Plaintiff's past jobs ( Exhibit 12E). The ALJ posed a hypothetical to Ms. Gianforte, asking whether a person of Plaintiff's age, education, and past work who has the limitations described in Dr. Miller's December 16, 2009 Medical Source Statement (Physical) as well as in the February 23, 2010 Medical Source Statement (Mental) from Dr. Singh and Dr. Gunn, could do any of Plaintiff's past work or any other work, including work with transferrable skills. Ms. Gianforte responded that such a person could perform Plaintiff's past jobs as a data entry clerk, accounts receivable clerk, and proof machine operator. She further opined that the hypothetical person could perform sedentary, unskilled jobs as a phone order taker, order clerk, and document preparer. Ms. Gianforte testified that her testimony about these jobs was not in conflict with the Dictionary of Occupational Titles.

Ms. Gianforte testified that, if a person was limited to sedentary, unskilled work and had only occasional use of her right dominant upper extremity, she could do no work. She also testified that

if a person would be frequently off task, there would be no jobs available to her. Finally, Ms. Gianforte testified that if a person required unscheduled breaks or would be absent from work more than two days per month, these limitations would be adverse factors to sustaining competitive employment.

## STANDARD OF REVIEW

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Thus, a court reviewing the findings of an ALJ will reverse only if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. *See Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, the question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ "uses the correct legal standards and the decision is supported by substantial evidence." *Roddy v. Astrue,* 705 F.3d 631, 636 (7th Cir. 2013) (citing *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010); *Prochaska v. Barnhart*, 454 F.3d 731, 734-35 (7th Cir. 2006); *Barnett v. Barnhart*,

16

381 F.3d 664, 668 (7th Cir. 2004)). "[I]f the Commissioner commits an error of law," the Court may reverse the decision "without regard to the volume of evidence in support of the factual findings." *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999) (citing *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997)).

At a minimum, an ALJ must articulate his analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995). An ALJ must "'build an accurate and logical bridge from the evidence to [the] conclusion' so that, as a reviewing court, we may assess the validity of the agency's final decision and afford [a claimant] meaningful review." *Giles v. Astrue*, 483 F.3d 483, 487 (7th Cir. 2007) (quoting *Scott*, 297 F.3d at 595)); *see also O'Connor-Spinner*, 627 F.3d at 618 ("An ALJ need not specifically address every piece of evidence, but must provide a 'logical bridge' between the evidence and his conclusions."); *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001) ("[T]he ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits.").

## DISABILITY STANDARD

To be eligible for disability benefits, a claimant must establish that she suffers from a "disability" as defined by the Social Security Act and regulations. The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). To be found disabled, the claimant's impairment must not only prevent her from

doing her previous work, but considering her age, education, and work experience, it must also prevent her from engaging in any other type of substantial gainful activity that exists in significant numbers in the economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f).

When a claimant alleges a disability, Social Security regulations provide a five-step inquiry to evaluate whether the claimant is entitled to benefits. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The steps are: (1) Is the claimant engaged in substantial gainful activity? If yes, the claimant is not disabled, and the claim is denied; if no, the inquiry proceeds to step two; (2) Does the claimant have an impairment or combination of impairments that are severe? If not, the claimant is not disabled, and the claim is denied; if yes, the inquiry proceeds to step three; (3) Do(es) the impairment(s) meet or equal a listed impairment in the appendix to the regulations? If yes, the claimant is automatically considered disabled; if not, then the inquiry proceeds to step four; (4) Can the claimant do the claimant's past relevant work? If yes, the claimant is not disabled, and the claim is denied; if no, then the inquiry proceeds to step five; (5) Can the claimant perform other work given the claimant's RFC, age, education, and experience? If yes, then the claimant is not disabled, and the claim is denied; if no, the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *see also Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004).

At steps four and five, the ALJ must consider an assessment of the claimant's residual functional capacity ("RFC"). The RFC "is an administrative assessment of what work-related activities an individual can perform despite [his] limitations." *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001). The RFC should be based on evidence in the record. *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(3)). The claimant bears the burden of

proving steps one through four, whereas the burden at step five is on the ALJ. *Zurawski*, 245 F.3d at 886; *see also Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

## ANALYSIS

Plaintiff seeks reversal and remand of the ALJ's finding of not disabled based on the ALJ's failure to properly evaluated Plaintiff's mental impairments; improper analysis at step three under the listings because the ALJ did not consider Plaintiff's mental impairments, obesity, neck impairment, or recent gall bladder surgery; errors committed in determining Plaintiff's credibility and formulating the RFC; and failure to reconcile the vocational experts' conflicting testimony and conflicts between identified jobs and the Dictionary of Occupational Titles. The ALJ's decision contains enough error, most of which the Court cannot discount as harmless, to warrant remand.

### A. Mental Impairments

Plaintiff argues that the ALJ erred by not acknowledging the diagnosis of depression by Dr. Singh and Dr. Gunn and by failing to follow the "special technique" used for evaluating mental impairments. On February 23, 2010, Dr. Singh and Dr. Gunn issued a Psychological Evaluation for the disability determination bureau, giving a diagnostic impression of major depressive disorder (recurrent) and assigning Plaintiff a GAF of 57.

The special technique, set forth in 20 C.F.R. §§ 404.1520a and 416.920a, is used at steps two and three of the evaluation process to determine whether a claimant has a medically determinable mental impairment and whether that impairment causes functional limitations. *Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008); SSR 96-8p. Under the special technique, the ALJ must first determine whether a claimant has a medically determinable mental impairment(s) by evaluating the claimant's "pertinent symptoms, signs, and laboratory findings." 20 C.F.R. §§ 404.1520a(b)(1), 416.920a. If

19

the claimant has a medically determinable mental impairment, the ALJ must document that finding and rate the degree of limitation in four broad "functional areas" known as the "B criteria": activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. *Pepper v. Colvin*, 712 F.3d 351, 365 (7th Cir. 2013) (citing § 404.1520a(c)(3); *Craft,* 539 F.3d at 674 (citing 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00 *et seq.* )). The first three functional areas are rated on a five-point scale: none, mild, moderate, marked, and extreme. *Id*. (citing § 404.1520a(c)(4)). The final area, decompensation, is rated on a four-point scale: none, one or two, three, four or more. *Id.* (same).

Each rating assigned corresponds to a determination of the severity of the mental impairment. *Id*. (citing § 404.1520a(d)(1)). If the ALJ finds that the impairment is severe, the ALJ must then determine whether the impairment meets or is equivalent in severity to a listed mental disorder. *Id*. (citing § 404.1520a(d)(2)). The claimant is conclusively disabled at step three if a limitation is of listings-level severity. *See Craft*, 539 F.3d at 674. If the mental impairment neither meets nor is equivalent in severity to any listing, the ALJ will assess the claimant's RFC. *Pepper*, 712 F.3d at 365 (citing 404.1520a(d)(3)). The ALJ must document use of the technique, incorporating the relevant findings and conclusions into the written decision. *Id*. (citing § 404.1520a(e)(4)). The decision must adequately discuss "the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the [claimant's] mental impairment(s)." §§ 404.1520a(e)(4); 416.920a(e)(4). The decision must include "a specific finding as to the degree of limitation in each of the functional areas[.]" *Id.*

In his written decision, the ALJ in this case did not apply the special technique in evaluating Plaintiff's depression. In fact, the ALJ does not mention any mental impairment at either step two or step three of his analysis. The first mention of a mental impairment is in the RFC determination at the top of page 5 of the decision. At step three, the ALJ found, in three short sentences, that Plaintiff's combination of impairments do not equal a listing based on the opinion of the medical expert, Dr. Miller. However, Dr. Miller testified at the December 16, 2009 hearing, and Plaintiff's depression was not diagnosed until February 23, 2010. Thus, there is no indication that Plaintiff's depression was considered in determining whether the combination of her impairments equaled a listing. *See* 20 C.F.R. §§ 404.1523, 416.923; §§ 404.1526(c), 416.926(c). The Commissioner admits as much, arguing instead that the omission was harmless. The Seventh Circuit Court of Appeals has held that, "[u]nder some circumstances, the failure to explicitly use the special technique may . . . be harmless error." *Craft*, 539 F.3d at 675. But this is true only when the ALJ provides "enough information to support the 'not severe' finding," and those reasons are supported by medical evidence. *See Pepper,* 712 F.3d at 366 (internal quotation omitted).

As argued by the Commissioner, despite the omissions at steps two and three, the ALJ took Plaintiff's depression into account in formulating the RFC. *See* §§ 404.1520a(d)(3); 416.920a(d)(3). Relying on Dr. Singh and Dr. Gunn's evaluation, the ALJ included a mental limitation in the RFC of a mild limitation in Plaintiff's ability to respond appropriately to usual work situations and to changes in a routine work setting. Dr. Singh and Dr. Gunn's evaluation is the only evidence of record indicating that Plaintiff suffers from a mental impairment. On the Medical Source Statement of Ability to Do Work-Related Activities (Mental), the only limitation Dr. Singh imposed was a mild limitation in Plaintiff's ability to respond appropriately to usual work situations and to changes in

a routine work setting. This is the limitation the ALJ incorporated into the RFC. Nevertheless, because the Court is remanding this matter for other reasons set forth below, on remand, the ALJ is instructed to properly conduct the special technique at steps two and three in assessing Plaintiff's mental impairment.

Plaintiff also argues that the ALJ erred in formulating the RFC because he did not discuss Dr. Singh and Dr. Gunn's assessment of a GAF of 57, which Plaintiff argues indicates moderate difficulty in functioning. "[N]owhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF score." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010); *see also Walters v. Astrue*, 444 F. App'x 913, 919 (7th Cir. 2011). A GAF rating is a measure of both the severity of symptoms *and* functional level. *Denton*, 596 F.3d at 425. "Because the final GAF rating always reflects the *worse* of the two, the score does not reflect the clinician's opinion of functional capacity." *Id.* (emphasis added) (internal quotation marks omitted) (quoting Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 32-34 (Text Revision, 4th ed. 2000)).

In this case, Dr. Singh and Dr. Gunn did not simply assign a GAF score; rather, they completed the Medical Source Statement (Mental), in which Dr. Singh explicitly identified Plaintiff's functional capacity, imposing no limitations based on her depression other than the mild limitation discussed above. Thus, contrary to Plaintiff's suggestion, there is no inconsistency between this mild limitation and the GAF of 57. The ALJ should have discussed the GAF of 57, but because there is no uncertainty as to the meaning of the GAF score in light of the Medical Source Statement's identification of only one mild limitation, the error is harmless and remand is not

warranted on this basis.[1] Again, however, because the case is being remanded for other reasons, the ALJ shall consider and discuss the GAF score on remand.

## B. Step Three Listing

At step three of the disability evaluation process, the ALJ must determine whether the claimant's impairments meet or equal the criteria of a listing of impairments; if they do, the claimant must be found to be disabled. 20 C.F.R. § 404.1520(a)(4)(iii), 416.920(a)(4)(iii). Moreover, the combined effect of all of a claimant's impairments must be considered to determine whether they are medically equivalent to a listed impairment. 20 C.F.R. §§ 404.1523, 416.923; §§ 404.1526(c), 416.926(c).

First, Plaintiff again notes that the ALJ did not consider her depression in assessing medical equivalence. On remand, the ALJ is instructed to consider Plaintiff's depression in combination with her other impairments at step three.

Next, Plaintiff argues that the ALJ failed to consider the effects of her obesity. Nowhere in the decision does the ALJ mention Plaintiff's obesity. Social Security 02-1p requires that the ALJ consider Plaintiff's obesity along with her other severe impairments to determine if she meets a listing. *See* SSR 02-1p, 2002 WL 34686281 (Sept. 12, 2002).[2] At five foot, seven inches tall and

---

[1] This Court addressed the same argument in *Pomilia v. Astrue* and discussed why the cases cited by the plaintiff in that case, which are the same as the cases cited by Plaintiff in this case, do not change this conclusion. 2:11cv15, 2012 WL 691628, at *12 (N.D. Ind. Mar. 2, 2012).

[2] SSR 02-1p provides, in relevant part:
We will also find equivalence if an individual has multiple impairments, including obesity, no one of which meets or equals the requirements of a listing, but the combination of impairments is equivalent in severity to a listed impairment. For example, obesity affects the cardiovascular and respiratory systems because of the increased workload the additional body mass places on these systems. Obesity makes it harder for the chest and lungs to expand. This means that the respiratory system must work harder to provide needed oxygen. This in turn makes the heart work harder to pump blood to carry oxygen to the body. Because the body is working harder at rest, its ability to perform additional work is less than would otherwise be expected. Thus, we may find that the combination of a pulmonary or cardiovascular impairment and obesity has signs, symptoms, and laboratory findings that are of equal

weighing 250 pounds, Plaintiff has a BMI of 39.2, which is considered class-two, severe, or moderate risk obesity. While the ALJ relied on the testimony of Dr. Miller, the medical expert, to make his finding at step three, Dr. Miller also did not acknowledge or discuss Plaintiff's obesity. Thus, nothing in the opinion indicates that the ALJ factored Plaintiff's obesity into his analysis. When determining the combined impact of an applicant's impairment, an ALJ must factor in obesity. *See Villano v. Astrue*, 556 F.3d 558, 562-63 (7th Cir. 2009); *see also Arnett v. Astrue*, 676 F.3d 586, 593 (7th Cir. 2012) (addressing the ALJ's failure to consider obesity in formulating the RFC (citing *Martinez*, 630 F.3d at 698-99); *Clifford*, 227 F.3d at 873. Plaintiff's physical complaints include back pain, knee pain, and ankle swelling, all of which could be impacted by her obesity. *See Barrett v. Barnhart*, 355 F.3d 1065, 1068 (7th Cir. 2004) (finding that the ALJ erred by not explaining the consideration given to the claimant's obesity); *see also Gentle v. Barnhart*, 430 F.3d 865 (7th Cir. 2005) (holding that the ALJ erred by failing to account for the effects of obesity on the claimant's ability to sit or stand). If the ALJ thought that Plaintiff's obesity did not result in limitations on her ability to work, he should have explained his reasoning and conclusion. This failure requires remand.

At step three, the ALJ also did not consider Plaintiff's neck pain. Plaintiff testified that she experienced significant pain that radiates from her neck down her right side to her hand and foot. A November 2007 MRI of Plaintiff's cervical spine revealed broad-based degenerative disk protrusion with moderate canal stenosis and deformity of thecal sac anteriorly at C4-5 level and broad-based disk bulge flattening of thecal sac anteriorly at the C5-6 level. Dr. Miller did not discuss Plaintiff's neck pain. This, in combination with the failure to consider her mental impairment and

---

medical significance to one of the respiratory or cardiovascular listings.
SSR 02-1p, 2002 WL 34686281 (Sept. 12, 2002).

her obesity, requires remand for a proper step three determination. On remand, the ALJ shall consider and discuss Plaintiff's neck pain at step three.

Finally, Plaintiff notes that the ALJ did not discuss Plaintiff's February 2, 2010 surgery to remove her gall bladder. Dr. Miller gave his opinion in December 2009, prior to the surgery. It is not clear what, if any, continuing limitations Plaintiff has as a result of the surgery. Nevertheless, because one of Plaintiff's recurring complaints is abdominal pain, the ALJ shall consider and discuss Plaintiff's gall bladder surgery on remand.

## C. Credibility

In making a disability determination, social security regulations provide that the Commissioner must consider a claimant's statements about her symptoms, such as pain, and how the claimant's symptoms affect her daily life and ability to work. *See* 20 C.F.R. §§ 404.1529(a); 416.929(a). Subjective allegations of disabling symptoms alone cannot support a finding of disability. *Id*. In determining whether statements of pain contribute to a finding of disability, the regulations set forth a two-part test: (1) the claimant must provide objective medical evidence of a medically determinable impairment or combination of impairments that reasonably could be expected to produce the alleged symptoms; and (2) once an ALJ has found an impairment that reasonably could cause the symptoms alleged, the ALJ must consider the intensity and persistence of these symptoms. *Id*.

The ALJ must weigh the claimant's subjective complaints, the relevant objective medical evidence, and any other evidence of the following factors:

(1)     The individual's daily activities;
(2)     Location, duration, frequency, and intensity of pain or other symptoms;
(3)     Precipitating and aggravating factors;
(4)     Type, dosage, effectiveness, and side effects of any medication;

(5)      Treatment, other than medication, for relief of pain or other symptoms;

(6)      Other measures taken to relieve pain or other symptoms;

(7)      Other factors concerning functional limitations due to pain or other symptoms.

*See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). In making a credibility determination, Social Security Ruling 96-7p provides that the ALJ must consider the record as a whole, including objective medical evidence, the claimant's statement about symptoms, any statements or other information provided by treating or examining physicians and other persons about the conditions and how the conditions affect the claimant, and any other relevant evidence. *See* SSR 96-7p, 1996 WL 374186 (Jul. 2, 1996); *see also* §§ 404.1529(c)(1), 416.929(c)(1).

An ALJ is not required to give full credit to every statement of pain made by the claimant or to find a disability each time a claimant states she is unable to work. *See Rucker v. Chater*, 92 F.3d 492, 496 (7th Cir. 1996). However, Ruling 96-7p provides that a claimant's statements regarding symptoms or the effect of symptoms on her ability to work "may not be disregarded solely because they are not substantiated by objective evidence." SSR 96-7p at *6. "Because the ALJ is 'in the best position to determine a witness's truthfulness and forthrightness . . . this court will not overturn an ALJ's credibility determination unless it is 'patently wrong.'" *Shideler v. Astrue*, 688 F.3d 306, 310-11 (7th Cir. 2012) (quoting *Skarbek v. Barnhart*, 390 F.3d 500, 504-05 (7th Cir. 2004)); *see also Prochaska*, 454 F.3d at 738. Nevertheless, "an ALJ must adequately explain his credibility finding by discussing specific reasons supported by the record." *Pepper*, 712 F.3d at 367 (citing *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009)).

Plaintiff notes that the ALJ impermissibly employed the well-known "boilerplate" language at the outset of the credibility determination. *See, e.g.*, *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012). However, an ALJ's use of the boilerplate language does not amount to reversible error

if he "otherwise points to information that justifies his credibility determination." *Pepper*, 712 F.3d at 367-68. In this case, the use of "boilerplate" language alone does not require remand because the ALJ analyzed evidence to explain his credibility determination. *See Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012).

Nevertheless, the ALJ's analysis is deficient in following the requirements of SSR 96-7p because the ALJ did not properly consider Plaintiff's medications, headaches, and need to lie down. First, Plaintiff argues that the ALJ did not consider the type, dosage, effectiveness, and side effects of her medications, noting that she was prescribed at least 13 different medications on an outpatient basis between October 2008 and June 16, 2010: amlodopine besylate, diovan, claritin, hydrochlorothiazide, ibuprofen, naprosyn, nifedipine, nicardipine, norco, omeprazole, proventi, ultram, and ventolin. Plaintiff notes that several of these medications have the potential side effect of headaches, drowsiness, or fatigue and that she testified about headaches, tiredness, and the need to lie down. The ALJ did not consider the side effects of Plaintiff's medications; rather, the ALJ only discussed Plaintiff's use of medication by stating that Plaintiff "did not state that over-the-counter medication were ineffective for purported headaches." (AR 24). Plaintiff's testimony about her headaches, tiredness, and need to lie down could not properly be evaluated without taking into account how her medications affect these conditions. On remand, the ALJ shall discuss the side effects of Plaintiff's medications on her daily activities. *See Dross-Stewart v. Astrue*, 872 F. Supp. 2d 780, 798 (N.D. Ind. 2012); SSR 96-7p; *see also Herron v. Shalala*, 19 F.3d 329, 336 (7th Cir. 1994); *compare Schaaf v. Astrue*, 602 F.3d 869, 876 (7th Cir. 2010) (finding that the ALJ did not err in the analysis of the claimant's medication because there was no indication in the record to support the conclusions the claimant suggested).

As for her headaches, the ALJ stated that Plaintiff's medical records do not reflect complaints about headaches. Although there are treatment records in which no notation is made regarding headaches, Plaintiff did complain of headaches on several occasions. *See* (AR 402, 427, 431, 670, 750). Because of the ALJ's treatment of the medical evidence, it appears that the ALJ did not fully consider Plaintiff's headaches. On remand, the ALJ shall discuss the medical records reflecting Plaintiff's complaints.

Finally, the ALJ did not address Plaintiff's testimony that she needs to lie down for a few hours daily. Thus, the ALJ did not properly consider whether Plaintiff's need to lie down would preclude her from sustaining full-time work. *See Bjornson*, 671 F.3d at 646-48; *Martinez v. Astrue*, 2:09-CV-62, 2009 WL 4611415, at *12 (N.D. Ind. Nov. 30, 2009) (citing *McQuestion v. Astrue*, 629 F. Supp. 2d 887, 898 (E.D. Wis. 2009)); *see also Clifford*, 227 F.3d 863 at 872.

The Commissioner notes that the ALJ's credibility determination properly relied on the ALJ's observations of Plaintiff at the hearing. *See Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000). However, the ALJ's reliance on his observations do not excuse him from considering the favorable evidence and discussing Plaintiff's alleged limitations. On remand, if the ALJ continues to find Plaintiff not credible, he can come to the same conclusion with a properly supported decision.

### D. RFC

The Plaintiff argues that the ALJ made two errors in the RFC determination. The Commissioner responds to neither.

*1.      Sitting and Standing Limitations*

First, Plaintiff contends that the ALJ erred in formulating an RFC that requires Plaintiff to walk or stand three hours without interruption and to stand six hours total in an 8-hour work day.

In making this finding, the ALJ relied on the testimony of Dr. Miller, adopting Dr. Miller's opinions set forth in his December 16, 2009 Medical Source Statement. However, several of Dr. Miller's opinions were based on a misreading of the medical records.

Plaintiff testified at the December 16, 2009 hearing that her doctor prescribed a cane for her in 2009 and that she was given a cane at a subsequent emergency room visit. She testified that she uses the cane because her right leg bothers her. She can walk about a block with the cane but only a few feet without it. She testified that she can stand for approximately 10 minutes, that she experiences swelling of both ankles and her right knee, and that her doctors have advised her to elevate her legs because of her ankle problems. Yet, Dr. Miller opined that Plaintiff does not need a cane, opining that it was not medically necessary. Dr. Miller does not discuss the evidence that on two occasions, treating physicians either prescribed a cane for Plaintiff or provided her with one.

Medical personnel also provided Plaintiff with a brace for her right ankle and compression stockings because of edema in both of her lower extremities. Dr. Miller testified that he was not aware of any medical evidence indicating that Plaintiff experienced swelling of her ankles. However, the medical records on August 24, 2005, August 25, 2008, and January 27, 2009, indicate edema. Plaintiff testified that her doctor instructed her to elevate her legs because of her ankles, which Dr. Miller also did not discuss.

As for Plaintiff's knees, Dr. Miller acknowledged that Plaintiff has arthritis but then discounted her impairment, in part, because there is no evidence of effusion. However, there is medical evidence of effusion (AR 744, 750) and swelling (AR 691, 744) of Plaintiff's right knee and limited range of motion in both knees (AR 750). As discussed above, neither Dr. Miller nor the ALJ articulated whether they considered how Plaintiff's obesity would interact with Plaintiff's knee

29

and ankle impairments. The Court remands this matter for the ALJ to consider this evidence regarding Plaintiff's ability to stand and walk in formulating the RFC.

2.      *Right Hand and Arm*

Second, Plaintiff argues that the ALJ erred by not limiting Plaintiff in the use of her right hand and arm. Plaintiff, who is right handed, testified that, because of weakness in her right hand, she drops more than half of the things she tries to hold with it and she has problems buttoning her clothes, using a zipper, doing her hair, and using the computer. She testified that when she writes with her right hand, it cramps and stiffens so that she cannot write for a long time. She cannot reach over her head with her right arm. She experiences swelling in her right arm and hand, and while she can lift a gallon of milk with her left hand, she can lift only a half gallon with her right hand.

Dr. Miller, the medical expert, testified that Plaintiff complained about right-handed weakness but that on July 2, 2008, Dr. Smejkal found that Plaintiff's grip strength was normal. Yet, neither Dr. Miller nor the ALJ considered other medical evidence indicating that Plaintiff's right hand grip strength was not normal: the referral to occupational and physical therapy for right hand weakness; the January 31, 2006 assessment of 4/5 strength of the upper right extremities during a physical therapy evaluation; the August 28, 2007 finding of right hand strength of 4/5; Dr. Kelly's October 17, 2007 examination finding bilateral hand weakness; the November 21, 2007 assessment of 4/5 right hand, wrist, and forearm strength by the occupational therapist; and that Plaintiff's grip strength remained abnormal after five treatments of occupational therapy.

The ALJ's failure to discuss the favorable evidence regarding right hand and arm strength affects the credibility determination because the ALJ discounted Plaintiff's testimony about her right hand based on Dr. Smejkal's finding. This failure also affects the RFC determination because the

ALJ found that Plaintiff has the ability to use her right hand frequently for fingering and handling. The ALJ may have an explanation for why he gave greater weight to Dr. Smejkal's opinion, but he did not provide it; the ALJ's failure to discuss the favorable evidence requires remand. *Zurawski*, 245 F.3d at 888-89 (reemphasizing that "'an ALJ may not ignore an entire line of evidence that is contrary to [his] findings,' rather [he] must 'articulate at some minimal level [his] analysis of the evidence' to permit an informed review" (quoting *Henderson v. Apfel*, 179 F.3d 507, 514 (7th Cir. 1999); *Clifford*, 227 F.3d 872). As discussed in the next section, the evidence indicating that Plaintiff has limitations in the use of her right hand and arm is implicated in the vocational experts' testimony that if Plaintiff has only occasional use of her right dominant extremity, no sedentary jobs would be available to her. In addition, the light jobs identified by the ALJ are also impacted by Plaintiff's ability to finger and reach.

### E. Jobs in the Economy

Finally, the ALJ's failure to reconcile the differences between the testimony of the two vocational experts requires remand. The ALJ found that Plaintiff's RFC would allow her to perform her past jobs as a data entry clerk, accounts receivable clerk, and machine operator. The ALJ then relied on the hypothetical question answers of Ms. Gianforte, the vocational expert at the second hearing, to support his finding that Plaintiff could perform these past jobs. The hypothetical included the physical RFC limitations identified by Dr. Miller and the mental RFC limitations identified by Dr. Singh and Dr. Gunn.

First, for the reasons set forth in the previous sections, this hypothetical based on the opinion of Dr. Miller is flawed because he failed to consider favorable evidence and the impact of certain

impairments on Plaintiff's ability to sustain full-time employment, including potentially overestimating Plaintiff's ability to stand and walk and to use her right hand.

Second, in relying on Ms. Gianforte's opinion that Plaintiff could perform her past jobs as a data entry clerk, accounts receivable clerk, and proof machine operator, the ALJ ignored Mr. Gusloff's directly contradictory answer from the first hearing that the hypothetical person could *not* perform Plaintiff's past jobs.[3] The ALJ's failure to consider and seek to reconcile conflicting vocational evidence was an error necessitating remand. *See Young v. Sec'y of HHS*, 957 F.2d 386, 392-93 (7th Cir. 1992).

Third, Plaintiff argues that Ms. Gianforte's assertion that her testimony about jobs was consistent with the Dictionary of Occupational Titles ("DOT") is inaccurate as information in the DOT about Plaintiff's past jobs contradicts Ms. Gianforte's testimony. The DOT provides that the data entry clerk job requires constant fingering, and the hypothetical posed to Ms. Gianforte included a limitation to frequent fingering with both hands. *See* Dep't of Labor, Dictionary of Occupational Titles 203.582-054 (G.P.O.), 1991 WL 671700 (4th ed, rev'd 1991).

Social Security Ruling 00-4p provides, "When there is an apparent unresolved conflict between VE . . . evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE . . . evidence to support a determination or decision about whether the claimant is disabled." SSR 00-4p, 2000 WL 1898704, at *2 (Dec. 4, 2000). However, as argued by the Commissioner, an ALJ's reliance on imperfect VE testimony does not warrant remand if a claimant does not question the basis for the testimony at the time of the hearing. *Overman v. Astrue*,

---

[3] While Ms. Gianforte was asked to consider both the physical and mental medical source statements, Mr. Gusloff was only asked to consider the physical medical source statement because the mental medical source statement did not yet exist.

546 F.3d 456, 455-56 (7th Cir. 2008) (citing *Donahue v. Barnhart*, 279 F.3d 441, 446-47 (7th Cir. 2002); *Barrett v. Barnhart*, 355 F.3d 1065, 1067 (7th Cir. 2004)). Nevertheless, if the conflict was "'obvious enough that the ALJ should have picked up on [it] without any assistance,'" remand is required. *Terry*, 580 F.3d at 478 (quoting *Overman*, 546 F.3d at 463).

Although Plaintiff's counsel at the hearing did not question the basis of Ms. Gianforte's testimony, it is disingenuous of the Commissioner to contend that there was no apparent conflict in light of Mr. Gusloff's testimony just months before that Plaintiff could *not* perform her past work. Moreover, as Plaintiff contends, even a lay person without experience as an ALJ would suspect that data entry jobs involve constant work at a keyboard. The proof machine operator position requires both constant handling and reaching. *See* DOT 217.382-101 (G.P.O.), 1991 WL 671944 (4th ed, rev'd 1991). All three past jobs require at least frequent reaching, yet the hypothetical to Ms. Gianforte included a limitation to no overhead reaching and only occasional other reaching with the right hand. Social Security Ruling 85-15 defines reaching as the ability to extend both hands and arms in any direction. SSR 85-15, 1985 WL 56857, at *7 (1985).[4] On remand, the ALJ must reconcile this conflict.

Finally, as to Ms. Gianforte's testimony that Plaintiff could perform other jobs as a phone order clerk, order clerk, and document preparer, these jobs also require reaching frequently or occasionally using both arms and hands to move in any direction. *See* DOT 237.367-014, 1991 WL

---

[4] SSR Ruling 85-15 provides, in part:
*Reaching, handling, fingering, and feeling* require progressively finer usage of the upper extremities to perform work-related activities. Reaching (extending the hands and arms in any direction) and handling (seizing, holding, grasping, turning or otherwise working primarily with the whole hand or hands) are activities required in almost all jobs. Significant limitations of reaching or handling, therefore, may eliminate a large number of occupations a person could otherwise do. Varying degrees of limitations would have different effects, and the assistance of a VS may be needed to determine the effects of the limitations.
SSR 85-15, 1985 WL 56857, at *7 (1985).

672186 (reaching: occasionally); DOT 209.567-014, 1991 WL 671794 (reaching: frequently); DOT 249.587-018, 1991 WL 672349 (reaching: frequently). Because the RFC does not include the use of the right hand to reach overhead, it appears that this limitation precludes performance of these other jobs. On remand, the ALJ shall resolve this apparent conflict.

## CONCLUSION

Based on the foregoing, the Court hereby **GRANTS** the relief sought in Plaintiff's Brief in Support of Reversal of Commissioner's Final Decision [DE 17], and **REMANDS** the Commissioner of Social Security's final decision for further proceedings consistent with this Opinion and Order.

So ORDERED this 11th day of March, 2014.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc:     All counsel of record